UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ROBERT W. HUBER JR.
    Plaintiff,

v.                                Case No. 16 – C – 0019

GLORIA ANDERSON; et. al.
    Defendants.

## AFFIDAVIT OF ROBERT W. HUBER JR.

I, Robert W. Huber Jr. being duly sworn on oath, depose and state the foregoing narrative to be true and accurate to the best of my recollection:

I.    SENTENCING ON CASE 88CF0113

¶ 1.    On November 3, 1988, I appeared before Judge William Gardner in Branch 16 of the Milwaukee County Circuit Court for sentencing in case no. 88CF0113. At sentencing Judge Gardner stated that he was not going to order me to pay $824.87 in restitution because I was not the "mastermind" of the crime; nor had received any benefit of the proceeds of the crime; furthermore, I had taken full responsibility for my actions; and neither Charles Kerkhoff nor the bank had filed a claim for restitution to be paid.

¶ 2.    Judge Gardner also stated that because I had only been charged and found guilty of stealing $824.87 and none of the other people responsible for stealing and using the credit cards had been charged; he could not legally order me to pay the entire $6221.23 that had been stolen by use of the stolen credit cards; but, he was willing to order to me to serve only 2 years of probation if I were to voluntarily agree to pay the money back.

¶ 3.    I told Judge Gardner that although I take full responsibility for my own actions, I do not agree to pay any amount more than I what I was personally responsible for. Judge Gardner stated that he respected my decision and ordered the sentence to be withheld and ordered me to serve 4 years of probation. However; Judge Gardner went on to state that if I should find within the first 2 years of probation that I could afford to pay the $6,221.23 and voluntarily chose to do so, I could come back to the court and he would order that the probation be discharged after the first 2 years were completed.

¶ 4.    I thanked him for the opportunity, but stated that I could not see myself being able to afford to pay that amount within 2 years, and that I had no problem accepting the 4 year term of probation. Judge Gardner reminded me that the option would still be available to me if I were to change my mind in the future; he wished me luck, and the hearing was completed.

1

## II. SERVICE TIME OF PROBATION

¶ 5. My first probation agent was Gloria Anderson. Almost immediately after I began reporting to her she began demanding that I bring her money, in cash, every visit to pay restitution. I told her that the court had not ordered me to pay any restitution and then proceeded to tell her about the option that the court had offered me. Anderson told me that the court had changed its mind and had decided that I was to pay the $6221.23 in restitution, and that I was to serve all 4 years of probation regardless of when the restitution was paid.

¶ 6. I contacted Public Defender Atty. Peter Goldberg, who had represented me in the case, and asked him about Anderson's claims. Atty. Goldberg stated that he was not aware of any change and that the court could not change its order after the fact without a hearing; but since he was no longer representing me, I would have to hire a lawyer to look into it.

¶ 7. I informed Anderson about what Atty. Goldberg had said. Anderson then admitted that the court had not ordered restitution, but stated that even though the court had not ordered me to pay restitution; the Department of Corrections had the authority to order me to pay restitution as a condition of my probation, and therefore that is what she was doing.

¶ 8. Anderson would constantly threaten that if I did not bring at least 20 dollars cash every visit she would put me in jail. Occasionally, she would give me a receipt for the money, but most of the time she did not. Whenever I asked for a receipt she would get angry and state that the Department of Corrections was not obligated to give me a receipt because I was a criminal. If I persisted in my inquiries she would threaten to lock me up.

## III. 1992 EXTENSION OF PROBATION

¶ 9. In October of 1992, I was being supervised by Agent Becky Lembke. During an office visit, Lembcke put documents in front of me and told me that they were forms that were being submitted to the court in order to determine whether or not my probation should be extended for the times I had allegedly absconded.

¶ 10. I was told by Lembcke that by signing and initialing the documents I was only acknowledging that I was aware the Department was asking for an extension and that I was waiving a formal hearing. At no time was I told that by signing the documents I was agreeing to an extension. When I did not immediately sign the documents and tried to read all of the information on the documents, Lembcke told the officer who was present to take me into custody. Lembcke stated that if I did not sign the document and initial the waivers right there and then, she would have me taken to the county jail and initiate revocation procedures. I signed the documents under that threat.

¶ 11. I further attest under oath that the name "Charles Kerkhoff"; the restitution amount of "$6,374"; and the number "3" were not included on the document; nor was the box indicating restitution as an unmet obligation checked, at the time that I signed it. Shortly afterwards my case was transferred to Agent Tonia Smith. When the extension became official, I was told by Agent Smith that the court had filled in that information at the time that the Judge signed the order.

### IV. FURTHER SUPERVISION

¶ 12. In February of 1993, Agent Smith notified me that I was being discharged on the "B case"; which was a misdemeanor theft case where I had been ordered to serve 1 year probation to run concurrent with the probation case in 88CF0113.

¶ 13. On May 19, 1993; I missed a scheduled appointment because I had been called in to work. I called Smith to explain what happened and to reschedule our appointment. At this time Smith informed me that my case was again being transferred to another agent and that she did not know to whom I would be reporting to. She further stated that the new agent would send me an appointment card notifying me about when to report.

¶14. In early July of 1993 I had not yet received any notification of who to report to, so I called Smith. During this conversation Smith told me that while preparing the case file for transfer, she discovered that there was no record of any Restitution Order on file; and therefore, she had submitted documents recommending that I be discharged. She stated that I no longer needed to report and that I would receive my discharge in the mail.

¶ 15. At the end of January, 1994 I received a letter from Supervisor Elizabeth Hartmann claiming that I had not completed the community service requirements of my supervision. I called Hartmann and informed her that I had in fact completed community service. I gave Hartmann the name and phone number of the woman whom I had worked under; and I informed Hartmann that I had been discharged from probation. At no time during our conversation did Hartmann ever tell me that I was wrong about being discharged, nor did she say that I was absconding. I did not receive any further notifications, nor had any other contact with the Department until November of 1994.

¶ 16. In November of 1994 I had been pulled over for a traffic violation and was informed by the officer that there was a violation of probation warrant for my arrest. I was taken into custody and transferred to the Milwaukee County House of Correction where Agent Anderson and Supervisor Hartmann came to see me. During our conversation I told them about my discharge, and that my father could verify that I had received discharge papers in the mail. I also reminded them about the conversation I had had with Hartmann in January. Anderson claimed that Smith had made a mistake in sending me discharge papers and that there was in fact a restitution order in place. I was released from custody and given a new appointment date. No revocation proceedings were ever initiated against me.

¶ 17. In the summer of 1995 I had gotten a job in Hartland, Wisconsin. Because the hours I worked and the distance I had to travel made it difficult to report to agent Anderson before office hours closed, Anderson began allowing me to report by telephone. I reported to Agent Anderson by telephone for the months of September and October. In the beginning of November I contacted Anderson to remind her that November 3, 1995 was my discharge date. She was not in the office and I had to leave a message. Anderson never returned my call.

¶ 18. In January of 1996 I was taken into custody on an alleged violation of probation warrant. I was again visited by Anderson and Hartmann at the House of Correction. Anderson told me that the time I had missed from May of 1993 and November of 1994 had been tolled and that my probation was not over yet. Anderson and Hartmann told me that they were going to release me from custody, but that in accordance with a new procedure, I had to sign a reinstatement form requesting that the hold on me be dropped. Anderson passed me a Request for Reinstatement form on which she had written my name and case number across the top. I began to read the document and when I got to the phrase "admit that I am guilty" I passed the document back and said that I wasn't signing it because I was not guilty of anything. Anderson used her pen to make a curlicue in the empty space as she explained that that is why there was nothing else written on the document; but that I still had to sign it in order to get the hold on me dropped. The date of "5 -19- 93" and the word "ABSConding" were not on the document at the time I signed.

¶ 19. A few months later, during an office, I noticed that the chronological log still said my discharge date was November 3, 1995. I accused Anderson of lying about my time being tolled from 1994 and told her I was not going to report anymore due to my discharge. I did not receive any correspondence, nor did anyone from the Department ever contact me with any claim that I was absconding.

¶ 20. Over the course of the next few years I had contact with police on at least five different occasions. At no time did any of the officers I had contact with say anything about any warrants other than one for an unpaid traffic ticket which I then paid.

¶ 21. In September of 1999 I was pulled over for a traffic violation and told there was a violation of probation warrant. I was taken into custody and transferred to the House of Correction, where I was visited by Agent Mike Walczak. During our conversation Walczak claimed that I had not been discharged. Walczak also claimed that he had personally spoke with Charles Kerkhoff, and that Mr. Kerkhoff was demanding to know when he was going to get his money. I knew that Charles Kerkhoff had died in 1988.

¶ 22. Like Anderson, Walczak would demand that I bring money every visit. In order to buy time while I researched and weighed my options, I would bring money orders for small amounts with me on my visits. Walczak seemed upset that I was bringing money orders and not cash, even suggesting that it would be better for me if I brought cash so that I would not have to pay the $2.00 - $3.00 purchase fee for the money orders.

## AFFIDAVIT OF ROBERT W. HUBER JR. (cont.)

¶ 23. I noticed that rather than taking the money orders to the cashier's window located in the offices, Walczak would instead put the money orders I gave him into his own wallet. This made me suspicious. In March of 2000, I asked Walczak how much restitution I still owed. Without even lifting a finger, or looking at any paperwork or computer screen, Walczak told me that the account information had not been updated yet, so he could not tell me how much I still supposedly owed.

¶ 24. Shortly thereafter, I was talking with an acquaintance who said he had relatives who worked for a government agency. I told him what was going on and he suggested that I report Walczak's actions to the Wisconsin Department of Justice. So the next day I called the Department of Justice and told them what was happening. I was told that they would look into the matter.

¶ 25. I stopped reporting to Walczak out of fear of retaliation for reporting him to higher authorities. In September of 2000 I received a letter from Walczak claiming that my restitution had been reduced to zero, and that I only needed to pay him $166.00 in supervision fees and I would receive my discharge papers.

¶ 26. On October 11, 2000 I was arrested on an alleged violation of probation warrant. I was transferred to the House of Correction. Revocation proceedings were initiated against me for alleged rules violations and alleged new criminal activity.

¶ 27. At the November 2000 revocation hearing, the Administrative Law Judge refused to hear any facts or evidence regarding the new criminal allegations and focused solely on the alleged rules violations of absconding and changing my address without notice.

¶ 28. At the same revocation hearing; Walczak admitted under oath that he had placed the money orders I brought to him into his wallet. He also testified to not placing a copy of the September 19, 2000 letter in my case file because he "expected that I would pay [him] off and get off probation". He also testified that my case file was incomplete and that other "exculpatory things" could also be missing from the file.

    IV.    LITIGATION IN ATTEMPTS TO OBTAIN RELIEF

¶ 29. After revocation and sentencing, state appointed counsel filed a post conviction motion pursuant to §809.30 on August 29, 2001. Judge Donald never addressed the jurisdictional issue on the merits. Instead, Judge Donald claimed that he was without authority to address the jurisdictional issue because counsel had failed to file for writ of certiorari immediately after revocation.

¶ 30. An appeal was filed, (State v. Huber, 01-AP-3083-CR). The Court of Appeals affirmed Judge Donald's assertion that he was without authority to address the matter on its merits. A Petition for Review was then filed in the State Supreme Court. The Supreme Court denied review without ever stating any reason for its decision.

| AFFIDAVIT OF ROBERT W. HUBER JR. (cont.) |
|---|

¶ 31. State appointed counsel next filed for a Writ of Habeas Corpus on September 26, 2005 in the State Courts (State ex rel. Huber v. Benik; 05cv8677). Judge Christopher Foley also did not address the jurisdiction issue on the merits; instead finding that I was not entitled to relief under Habeas Corpus because I was not alleging ineffective assistance of counsel. This finding was also affirmed by the Court of Appeals, (State ex rel. Huber v. Benik; 306 Wis. 2d 124, 740 N.W. 2d 901); and again, the State Supreme Court denied review without ever stating a reason for its decision to deny review.

¶ 32. After state appointed counsel withdrew and I received the case file from counsel in the beginning of 2008, I discovered Judge Donald's October of 2001 Order for a Briefing Schedule which stated that: "no paperwork from the Department of Corrections exists which establishes the varius time periods tolled which operated to extend the probationary period" thereby implying that the revocation order, as well as Judge Donald's own sentencing order were jurisdictionally void.

¶ 33. I filed a Petition to Vacate Order of Revocation Due to the Lack of Subject Matter Jurisdiction with the Division of Hearings and Appeals on February 11, 2008. Instead of addressing the issue on the merits and the facts presented in the petition; Asst. Administrator Diane Norman instead claimed that my argument that there was no paperwork showing time had ever been tolled prior to the expiration of probation in November of 1995 was actually an attempt to re-litigate whether my term of probation expired in September of 2000 when restitution had been reset to zero.

¶ 34. On March 17, 2008 I filed for A Writ of Certiorari in the state court, (State ex rel. Huber v. Schwarz; 08-cv-4145). In this case Judge DiMotto concluded that Ms. Norman was correct in claiming that arguing that probation time was never tolled before November 3, 1995 was exactly the same in every respect as arguing that probation ended in September of 2000 because restitution was set at zero. Judge DiMotto also falsely claimed that my argument that probation time was never tolled before my discharge date on November 3, 1995 had actually been repeatedly litigated and decided against me.

¶ 35. An appeal was filed, (State ex rel. Huber v. Schwarz; 323 Wis. 2d 822, 781 N.W. 2d 550); and the Court of Appeals affirmed Judge DiMotto's ruling despite the fact that the issues were not identical, and despite the fact that no other court had ever addressed and decided any jurisdictional issue on its merits. Again, a Petition for Review was filed and the State Supreme Court denied review without ever stating why.

¶ 36. In May of 2010, I filed for A Writ of Habeas Corpus in the Federal Court, (Huber v. Pugh; Federal Court for the Eastern District of Wisconsin case no. 10-C-435). In this case Judge William Griesbach ruled that I was time barred from raising subject matter jurisdiction issues and dismissed the case without aver addressing the issue on its merits.

¶ 37. I filed for a Certificate of Appealability and Judge Griesbach granted the certificate noting that if I was correct in my assertion about the Department having lost jurisdiction before discharge then I should have the opportunity to have that issue addressed on appeal. The State filed a motion in the 7th Circuit asking that my Certificate of Appealability be taken away, and the 7th circuit agreed. I filed a Motion for Reconsideration, and I was released from prison before receiving a response on that motion.

    V.    Release on Parole

¶ 38. In June of 2011, I was scheduled to have a conference call with Agent Niomi Bock and the Social Worker at the Stanley Correctional Institution regarding my scheduled release in October of 2011. Since several of the prior court decisions indicated that my issue regarding the fact that time had never been tolled prior to discharge was one that I needed to take up with the Department of Corrections, I decided to use the conference call as an opportunity to set the wheels in motion in efforts to resolve the matter before my release date.

¶ 39. During our conversation I explained to Bock how in the process of my Federal Writ of Habeas Corpus in 2010, I had discovered that Agent Anderson and Supervisor Hartmann had falsified documents to make it appear that a legal tolling of time had occurred after my term of probation had already discharged. I explained the matter in great detail, emphasizing that she and the Department would be violating my constitutional rights if they were to supervise me without having legal jurisdiction to do so. I offered to send her copies of the falsified documents along with a timeline of events and summary of case law so she could show them to her supervisor and the Office of Legal Counsel. The Social Worker said she would be willing to fax Bock the copies of the documents I was referring to. However; Bock told the Social Worker not to do it. Bock then when on to state that her only responsibility was to supervise me on parole. She said that if I had an issue with my revocation I needed to take the matter up with the Division of Adult Institutions and not the Division of Probation and Parole.

¶ 40. I told Bock that the courts had indicated that it was their issue to address, not the Division of Adult Institutions. I asked her if a meeting could be arranged where I could sit down with her, her supervisor, and someone from the Department of Corrections Office of Legal Counsel in order to go through the case file so I could show them what had happened regarding the falsified records. Bock said that that is something I would have to arrange through a lawyer. I informed her that I was currently litigating the matter and representing myself pro se, therefore, I was my lawyer. Bock stated that the Office of Legal Counsel would not meet with me unless I hired a lawyer. Bock reminded me that her only responsibility was to supervise me on parole and to make sure I was complying with the rules of supervision. Bock stated that it was "not [their] job to help criminals get off of supervision", and that, "that is what lawyers and the courts are for".

¶ 41. About a month prior to my release I had another conference call with defendant Bock and the Social Worker at the Stanley Correctional Institution. Defendant Walter was also a party on this conference call. The main topic of our discussion was that I was including the notation that I was reserving my right to challenge the jurisdiction of the Department. I stated that my reason for signing with the notation was so that the Department could not claim that I was voluntarily consenting to their jurisdiction. I repeated all of the same details about the falsified records and also repeated my request for a formal meeting between Bock, Walter, the DOC's Office of Legal Counsel and myself to go through the case file and other evidence regarding the Department's loss of jurisdiction. Like Bock, Walter repeated that I needed to hire a lawyer in order to talk to the Office of Legal Counsel. I again repeated that I was currently litigating the matter in the courts pro se, and therefore was my lawyer. Walter then stated and that their only responsibility was to supervise me on parole and not to assist me in getting off of supervision.

¶42. I was released from prison on the morning of October 11, 2011. After arriving at the bus station in Milwaukee I was met by Bock and another agent. They took me to the temporary living house where they made me sign more sets of rules. I signed these additional sets of rules with the same notations indicating that I was reserving my right to challenge the jurisdiction of the Department.

¶43. At my first office on October 13, 2011, Bock and I spent almost three hours doing paperwork and discussing parole related topics. I had brought copies of the falsified documentation with me, along with a timeline that I had created to better illustrate what had happened. I made repeated attempts to get Bock to look at the documentation, but she refused to do so. I asked Bock to give the documentation to her supervisor, and she refused to do so stating that I should hire a lawyer and take it up with the courts. I again told her that I was currently litigating the matter in the courts pro se and that I shouldn't have to pay for a lawyer in order to get her to do her job. She again reminded me that her only job was to supervise me, and that she had no interest in looking at anything, or doing anything that would help me get off of supervision. She refused to accept the paperwork that I tried to hand her

¶44. A week after my release, I went to see Bock for another scheduled appointment. When I arrived in her office she handed me an opened manila envelope. I turned it over and saw that it was addressed to me and had been sent via U.S. Mail from the 7th Circuit Court of Appeals. Inside the envelope were the original and three copies of my Motion for Reconsideration that I had filed with the court, along with a letter dated October 11, 2011 from the Clerk of Court stating that my motion was being returned to me un-filed. I asked Bock why she had opened my legal mail and she responded by claiming it was already opened when she received it through inter-departmental mail from the Stanley Correctional Institution. She also claimed that she did not know, nor had read, what was inside the envelope. At no time did I give her authorization to either read, or to make copies of, the legal documents contained in the envelope.

¶ 45. Because my Motion for Reconsideration had been returned to me un-filed, I needed to know what the next step in the legal process was. I called the Administration of both the University of Wisconsin, Milwaukee; and Marquette University to ask if they had a law library that was open to the general public. Marquette University said that they did have a law library that was open to non-students.

¶ 46. At my next appointment with Bock, I told her about my intent to go to Marquette's law library. She told me that if I did so, she would have my parole revoked. She said that if I wanted to do legal research at a library I would have to fill out an "activity request form" to use a public library only, and that it would have to be approved by her supervisor. A few days later Bock called me and left a message stating that my request had been denied, and that her supervisor had said that if I wanted to do legal research I had to do it at the DOC offices, under the direct supervision of an agent.

¶ 47. I called Bock back and in that conversation she told me that they had scheduled me for a two hour meeting with Agent Karen Buswell. Bock said that I had to tell Buswell what I was looking for and that Buswell would look for it on the computer for me. I asked about printing documents and Bock stated that I was not allowed to print anything. I asked how I was supposed to remember what had been found or get copies of any documents that I needed. Bock stated that her supervisor said I could save anything I needed onto a thumb-drive, but that I had to leave the thumb-drive with her so that she and her supervisor could check to make sure I hadn't downloaded anything inappropriate. Bock said that I could take the thumb-drive with me after it was inspected.

¶ 48. I met with Agent Buswell at the DOC offices on November 16, 2011. Due to the arrangement, I had to tell Buswell what I was looking for and she would spend ten to fifteen minutes looking for things I was not asking for before she would actually get around to looking for the information and/or documents I actually wanted. She would also get called away frequently and be gone for anywhere between five and twenty minutes at a time. At the end of the two hour session, all I came away with were the forms and instructions for filing a pro se petition for review in the United States Supreme Court.

¶ 49. Buswell downloaded the forms and instructions onto the thumb-drive I had brought with me. Then Buswell escorted me to Bock's office and handed Bock the thumb-drive. I expected Bock to inspect the thumb-drive and then give it back to me, but instead, she told me that she and her supervisor had to inspect it together, and that I could get it from her the following day when I showed up for my scheduled appointment.

¶ 50. The next day when I arrived at Bock's office for our scheduled appointment; Bock stated that I needed to resign the program participation papers that I had signed almost a month earlier because I had signed them with a notation indicating that I was signing under duress. Bock explained that I needed to re-sign the documents without including any notation.

¶ 51.   I informed Bock that because the Department's jurisdiction over me was not legally valid, I needed to sign the documents with notations indicating that I was either signing the documents under duress; and/or, that by signing the document I was not admitting to, nor was I voluntarily consenting to the Department having personal jurisdiction over me. I further stated that since I was told that if I did not sign the documents I would be immediately re-incarcerated, I was in fact signing under duress.

¶ 52.   I asked Bock what compromise could be reached so that they could be satisfied that I had signed their documents without me waiving any of my legal rights and objections to their jurisdiction. Bock told me that she would go and ask her supervisor and that I should wait in the lobby.

¶ 53.   After about half an hour, Bock led me back to her office where I was immediately surrounded by other DOC personnel and handcuffed. Bock said: "We are not trying to interfere with your access to the courts; but we need to take you into custody." I was arrested and taken to the Milwaukee Secure Detention Facility, and revocation procedures were initiated against me.

   VI.   REVOCATION PROCEEDINGS

¶ 54.   The Revocation hearing began on January 4, 2012, but was rescheduled for February 8, 2018 so a new attorney could be appointed to represent me.

¶ 55.   The hearing continued on February 8, 2012. During this proceeding I submitted a formal brief outlining the case law regarding subject matter jurisdiction. I also presented the facts and documentation establishing that no time had ever been told by the Department between the October 27, 1992 extension of probation and the November 3, 1995 discharge date of probation. Using documents and the chronological log, I established that an apprehension request had not been allegedly issued until two weeks after the discharge date of probation and also showed how Anderson and Hartmann had falsely claimed that I had absconded from May 19, 1993 all the way to January 8, 1996.

¶ 56.   The Administrative Law Judge, Vince Varrone, indicated that the Department probably had documentation in another file somewhere establishing that time had been tolled prior to November 3, 1995. ALJ Varrone scheduled another date for the hearing to continue and directed Bock to check all available resources for documentation establishing a tolling of time prior to November 3, 1995.

¶ 57.   The revocation hearing continued on March 13, 2012. At this time, Bock testified that she had found no documentation other than what was in the Department's case file; and more specifically that she found no documents establishing that time had been tolled before November 3, 1995. Then Bock testified that after discussing the matter with her supervisor, they decided that it was up to me to prove that the Department did not have jurisdiction and not their burden to prove they legally had jurisdiction.

## AFFIDAVIT OF ROBERT W. HUBER JR. (cont.)

¶ 58. Despite no evidence that time was ever tolled, ALJ Varrone concluded that jurisdiction had been created when the court imposed its sentence after revocation. ALJ Varrone also stated that even if the Division of Hearings and Appeals has the authority to vacate their own revocation orders, they should knowingly refuse to do so because I was such a bad person.

¶ 59. On May 25, 2012, state appointed counsel filed for a Writ of Certiorari, ( Huber v. Schwarz filed, 12CV6005) and on May 8, 2013, Judge Pocan ruled that the jurisdictional issue raised was one which could never have waived. Judge Pocan then remanded the matter back to Division of Hearings and Appeals for an evidentiary hearing. Shortly thereafter, the Department admitted that they had lost jurisdiction over me on November 3, 1995.

¶ 60. While going through the Department's case file provided by the defendants through my requests for discovery I confirmed what Agent Tonia Smith had told me in 1993; which was that there was no record of any DOC-31 Victim Reimbursement Data form ever being filed at the beginning of my probation.

¶ 61. Also, while inspecting the case file provided by the defendants, I discovered that there is no record of a DOC-58 Apprehension Request ever actually being filed by defendant Anderson on or about November 17, 1995.

I, Robert W. Huber Jr. being duly sworn on oath, affirm that the information contained in the above narrative is true and accurate to the best of my recollection.

Dated: Oct 4, 2016

Robert W. Huber Jr.
1101 Morrison Drive
P.O. Box 9900
Boscobel, WI 53805


Subscribed and sworn to before me
this 6 day of October, 2016.
Mary A. Lee
Notary, Public, State of Wisconsin
My commission expires: 07/29/2017