# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ROBERT W. HUBER, JR.,

                    Plaintiff,

v.                                                    Case No. 16-CV-19-JPS

GLORIA ANDERSON, ELIZABETH
HARTMANN, MIKE WALCZAK, NIOMI
BOCK, KATHY WALTER, and ALLAN
KASPRZAK,                                             **ORDER**

                    Defendants.

## 1.      INTRODUCTION

On October 7, 2016, Plaintiff Robert W. Huber, Jr. ("Huber") filed a motion for summary judgment. (Docket #57 to #62). On October 10, 2016, Defendants Gloria Anderson ("Anderson"), Elizabeth Hartmann ("Hartmann"), Mike Walczak ("Walczak"), Niomi Bock ("Bock"), Kathy Walter ("Walter"), and Allan Kasprzak ("Kasprzak") (collectively, "Defendants") filed their own motion for summary judgment. (Docket #63 to #71). The parties timely submitted their various responses and replies. (Docket #81 to #82, #85 to #88, and #91 to #94). The motions are fully briefed and, for the reasons explained below, Defendants' motion will be granted, and Huber's will be denied.

## 2.      STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides the mechanism for seeking summary judgment. Rule 56 states that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).

A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). Even under this standard, however, the Court "will not draw inferences that are 'supported by only speculation or conjecture.'" *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016).

## 4.    ANCILLARY MOTIONS

Before reaching the facts and the parties' arguments, the Court addresses their ancillary motions. On October 17, 2016, Huber filed a motion for sanctions against Defendants for not allowing him to participate in the preparation of the interim settlement report, which had been filed on October 10. (Docket #73). The Court requires such reports in every civil case solely for the purpose of determining the settlement status of each case prior to the filing of dispositive motions. Here, the report stated that no settlement negotiations have occurred. Whether or not Huber participated in preparing the report, that fact would not have changed. Huber's motion will be denied.

On November 11, 2016, Huber filed a combined motion to strike and for sanctions. (Docket #89). In this instance, Huber accused Defendants of offering false statements in their declarations related to the summary judgment motions. *Id.* This District's Local Rules discourage motions to strike in the context of summary judgment briefing. Civil L. R. 56(b)(9). The Comment to this Rule states that "[w]henever possible[,] all arguments relating to the other party's submissions should be contained in memoranda." *Id.* at Committee Comment to Civil L. R. 56(b)(9). All of Huber's argument in this motion is precisely within the scope of this Rule; it

should be included in his summary judgment materials, not an ancillary motion. This motion will also be denied.

On November 7, 2016, Defendants filed a motion to amend their summary judgment briefing. (Docket #75). Walczak's original affidavit, upon which the balance of the briefing relied, stated that he did not learn of Huber's accusation of theft until the November 2000 revocation hearing. (Docket #69 at 4-5). Defendants now offer an amended affidavit which states that Walczak was notified of the accusation on October 17, 2000, by Huber's offender statement. (Docket #76 at 6). As discussed below, whether Walczak knew of the accusation in October or November 2000 is immaterial; the statute of limitations had run on Huber's claims against Walczak long before Huber filed this lawsuit. Nevertheless, this motion will be granted so that Walczak's testimony may be complete and truthful.

## 4.    RELEVANT FACTS

Though the factual underpinnings of this case are long and convoluted, relatively few facts are material to the Court's ruling. The Court will, therefore, limit its discussion of the facts to the extent possible. In accordance with the standard of review, the facts and reasonable inferences therefrom are construed in Huber's favor.[1]

### 4.1    Anderson, Hartmann, Kasprzak, and Walczak

---

[1]Even applying this favorable standard of review, many of Huber's attempts to dispute the defendants' proffered facts must be ignored. Huber seems to believe that statements made under oath, standing alone, are not evidence, but instead require corroborating documents to be valid. *See* (Docket #86 at ¶ 2). This is incorrect. Testimony, by affidavit or otherwise, can be evidence of the matter it asserts so long as it comports with the Federal Rules of Evidence, including that the matter is within the witness' personal knowledge. *See* Fed. R. Evid. 601-603. In the cited example, Anderson is competent to testify about her educational background because she experienced it. *Id.*

Case 2:16-cv-00019-JPS   Filed 12/09/16   Page 3 of 22   Document 97

Anderson, a probation and parole agent, was assigned to supervise Huber between February 1994 and July 1997. When she received Huber's file, he was in "absconder" status, meaning that he had not been reporting as required by the terms of his supervision.[2] Based on her review of Huber's file, Anderson believed that Huber's supervision period should be tolled for the time he was absconding. Huber was arrested in November 1994 and Anderson attempted to institute regular supervision. However, Huber again began to abscond.[3] Eventually, in January 1996, Huber was again brought under supervision. At that time, Anderson completed a request for reinstatement form (the "Reinstatement Form") asking that Huber's supervision be tolled from May 1993, when Anderson believed Huber began absconding, until January 1996. Of course, this was not correct, as Huber had been sporadically under supervision for the past two years. Further, it came too late, as all parties here agree that Huber's supervision had ended on November 3, 1995.[4] Hartmann, a Corrections Field Supervisor overseeing Anderson's work, approved the Reinstatement Form that same month. Kasprzak, Region Chief for the Milwaukee Region, issued a reinstatement order based on the approved Reinstatement Form.

---

[2] Huber disputes whether he was actually absconding, but that is of no moment here.

[3] Huber also disputes that he absconded during this period, but again, it does not matter.

[4] Huber believes that Defendants' admission of this fact in this litigation dooms their defense, but the claims in this matter center on what Defendants believed at the time of their underlying contact, not what they know now. Defendants maintain that they did not learn of loss of jurisdiction (Anderson's failure to timely submit the Reinstatement Form) until 2013.

Case 2:16-cv-00019-JPS   Filed 12/09/16   Page 4 of 22   Document 97

Walczak, also a probation agent, was assigned to supervise Huber beginning in 1998. During this period of supervision, Huber made payments on various supervision-related obligations, which Walczak would take from Huber during their meetings.[5] Huber believed Walczak was simply pocketing that money for himself. Huber was arrested in late 2000 on various charges unimportant to this disposition. Walczak pursued revocation proceedings at that time. Huber claims that this was in retaliation for his theft accusations, while Walczak maintains that the revocation was based on Huber's new crimes. Huber was eventually transferred to a different agent.

### 4.2    Bock and Walter

Bock, another probation agent, was assigned to supervise Huber beginning in October 2011. Walter was Bock's supervisor during this time. Huber repeatedly complained to Bock that he was not properly subject to supervision. Bock consulted with Walter, who informed Bock that it was her job to supervise Huber, not advocate for his release therefrom.[6] Nevertheless, Walter called the Department of Corrections' Central Records Unit ("CRU"), which was the final authority on sentencing calculations and discharge dates. The CRU personnel confirmed that Huber was still subject to supervision, and Walter relayed that information to Bock. Huber claims that Bock and Walter were presented with the same information that later investigators determined showed Huber was not properly on supervision (see below), but they dispute that fact and reiterate their CRU contact.

---

[5] Huber contends that he had no such obligations, but does not dispute that he gave money to Walczak, which is all that is relevant for the Court's purposes.

[6] Walter asserts that she said this only to Bock, while Huber believes that she said it during a conference call in which he was a participant; the distinction is without consequence.

Case 2:16-cv-00019-JPS   Filed 12/09/16   Page 5 of 22   Document 97

In November 2011, Huber asked to do some legal research, and was granted permission. Bock briefly reviewed the contents of the flash drive which contained the results of that research, but did not read the documents which were stored there. Huber believes that Bock wanted to interfere with his efforts to extricate himself from supervision. Later in November, Bock confronted Huber about his refusal to sign certain forms necessary to continue his supervision programs. Bock discussed the issue with Walter, who directed that Huber be taken into custody. A different flash drive was found on Huber which contained sexually-explicit material, which he was not allowed to possess. Bock also learned that Huber had tested positive for marijuana use.

Bock initiated revocation proceedings against Huber for his refusal to sign the form, possessing the flash drive with explicit material, and the drug use. Both she and Walter testified that their actions in pursuing revocation had nothing to do with Huber's legal research. The revocation proceedings began in early 2012. At the initial hearing, Huber raised his time-tolling concerns, the court requested that Bock review her records to determine if time had properly been tolled. When the hearing was reconvened, Bock reported that her records did not show that time had been tolled, but that this did not mean that such records did not exist. Bock stated that Anderson had left notes regarding tolling and the Reinstatement Form, and that this supported the notion that they existed somewhere.

In 2013, Department of Corrections (the "Department") personnel performed an additional investigation into Huber's supervision. They reviewed all available documents, including those in "CACU," "WICS," and "Chronos" (the parties do not explain where these documents are held or who has access to them). They concluded that Huber should have been

discharged in 1995, and petitioned the court to vacate Huber's revocations after that date. On January 14, 2014, the court ordered that Huber's revocations be vacated.

**5.      ANALYSIS**

Defendants move for summary judgment as to all of Huber's claims. (Docket #63). The parties characterize the claims at issue as follows:

> On March 2, 2016, Huber received permission to proceed on Eighth Amendment false imprisonment, failure to intervene, and access to courts claims against the defendants.

(Docket #64 at 7) (Defendants).

> On March 2, 2016, Huber received permission to proceed on his complaints of false imprisonment under the 8th Amendment, failure to intervene, retaliation, access-to-the-courts, and deprivation of his voting rights by the defendants.

(Docket #85 at 9) (Huber).

Upon review of Magistrate Judge David E. Jones' March 2, 2016 screening order, the Court finds that the following claims are active:

1)      False imprisonment of Huber, under the Eighth Amendment, against all Defendants;

2)      Failure to intervene to prevent Huber's false imprisonment, against Bock and Walter;

3)      Interfering with Huber's access to courts, against Walczak, Bock, and Walter;

4)      Retaliation, under the First Amendment, against Walczak; and

5) Deprivation of Huber's right to vote, against all Defendants.[7] *See* (Docket #8 at 8-11).

The Court must note an issue with one additional potential claim. Huber's amended complaint makes no mention of a malicious prosecution claim. (Docket #25). However, in his screening order for the original complaint (which was identical to the amended version save for identifying a Doe defendant), Magistrate Jones referenced malicious prosecution as a possible claim. (Docket #8 at 7-8). Magistrate Jones did not explicitly state that Huber could proceed on such a claim. *Id.* Still, given the magistrate's discussion, Huber can be excused for believing that a malicious prosecution claim is part of his lawsuit.

Assuming the claim exists, it would not survive the resolution of the instant dispositive motions. The Seventh Circuit instructs that "a federal claim for malicious prosecution is actionable only if the state fails to provide an adequate alternative, whether called a claim of malicious prosecution or something else." *Julian v. Hanna*, 732 F.3d 842, 845 (7th Cir. 2013). Wisconsin recognizes a claim for malicious prosecution. *See Strid v. Converse*, 331 N.W.2d 350, 353-54 (Wis. 1983). Thus, Huber has not presented an actionable federal claim for malicious prosecution.

Nevertheless, the Court is empowered to exercise supplemental jurisdiction over this state law claim if it so chooses. 28 U.S.C. § 1367(a). It declines to do so here. As discussed below, all of Huber's federal claims will be dismissed. Usually, "when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims

---

[7]The success of this claim is dependent on the others; if Defendants did not commit any of the other constitutional violations Huber asserts, they could not have improperly denied him his right to vote.

rather than resolving them on the merits." *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994); *Ray v. City of Chicago*, 629 f.3d 660, 664 (7th Cir. 2011) ("Federal courts are rarely the appropriate forum for malicious prosecution claims."). However, it may keep and finally decide the state law claims by balancing various equitable factors. *Id.* The first of these is whether the statute of limitations would bar re-filing of the claim in state court. *Id.* As noted by Julian, "a malicious prosecution claim does not accrue until the criminal proceeding that gave rise to it ends in the claimant's favor." *Julian*, 732 F.3d at 845. Magistrate Jones correctly concluded that this was on January 14, 2014, when the state court vacated Huber's original sentence. (Docket #7 at 8). Thus, as to any malicious prosecution claim, Huber's suit was timely. If and when he files a malicious prosecution action in Wisconsin state court, he can argue that the statute of limitations should be tolled from the date he filed this lawsuit, as it was timely when filed here, and he was unaware that this Court would decline jurisdiction over the claim. *See* Wis. Stat. § 893.15; *Williams v. Kaerek Builders, Inc.*, 568 N.W.3d 313, 318 (Wis. Ct. App. 1997).

Second, the Court considers whether substantial judicial resources have already been devoted to the claim. *Wright*, 29 F.3d at 1251. Here, though the parties have engaged in discovery, they have devoted little argument to the malicious prosecution claim. In fact, Defendants do not argue it at all, and Huber makes only passing references in his response to *Defendant's* summary judgment motion; he says nothing about it in his own motion. *See generally* (Docket #58, #64, and #85). Thus, the Court finds no reason to depart from the general rule in favor of allowing Wisconsin courts to opine on a Wisconsin cause of action. Third, the Court can retain a state law claim if it is clear how it would be decided; in essence, if the Court finds the claim to be frivolous,

Case 2:16-cv-00019-JPS   Filed 12/09/16   Page 9 of 22   Document 97

it need not send the claim to state court. *Wright*, 29 F.3d at 1251-52. As discussed below, the Court does not reach the substance of Huber's false imprisonment claim against Anderson, Hartmann, Walczak, and Kasprzak, which is his vehicle for challenging the entire timeline of the underlying events from 1995 to 2014. Neither Magistrate Jones nor this Court found the claim to be frivolous at the screening stage, (Docket #8 and #27), and will not do so here.

### 5.1 Anderson, Hartmann, Kasprzak, and Walczak

Under the above assessment of Huber's claims, those against Anderson, Walczak, Hartman, and Kasprzak must be dismissed because they were brought outside the applicable statute of limitations. As to Anderson, Hartman, and Kasprzak, their involvement in Huber's claims ended in 1996, and as to Walczak, in 2000. Wisconsin's six-year statute of limitations governs constitutional claims brought pursuant to 42 U.S.C. § 1983. *Wudtke v. Davel*, 128 F.3d 1057, 1061 (7th Cir. 1997); Wis. Stat. § 893.53. Thus, it would appear that Huber missed his filing window by at least a decade as to these defendants.

However, a claim does not necessarily accrue—and, consequently, the statute of limitations does not begin to run—on the day the wrongful act occurred. This principle, known as the "discovery rule[,] starts the statute of limitations running only when the plaintiff learns that he's been injured, and by whom." *U.S. v. Norwood*, 602 F.3d 830, 837 (7th Cir. 2010) (citing *United States v. Kubrick*, 444 U.S. 111 (1979); *Cada v. Baxter Healthcare Corp.*, 920 F.2d

446, 450 (7th Cir.1990)).[8] However, "the date of discovery is when a reasonably diligent person should have discovered the injury, not necessarily when the plaintiff himself actually discovers it." *Jamison v. Urban*, 411 F. App'x 919, 920 (7th Cir. 2011).

Defendants contend that Huber knew of his injury, namely being falsely imprisoned, and who did it, employees of the Department, as early as

---

[8]The parties do not clearly state what law applies to these questions. State law provides the statute of limitations and tolling rules, while federal law governs accrual. *Kelly v. City of Chicago*, 4 F.4f 509, 511 (7th Cir. 1993). In any event, Wisconsin's formulation of the discovery rule is similar to the federal rule stated above:

> It is well settled that a cause of action accrues when there exists a claim capable of enforcement, a suitable party against whom it may be enforced, and a party with a present right to enforce it. A party has a present right to enforce a claim when the plaintiff has suffered actual damage, defined as harm that has already occurred or is reasonably certain to occur in the future.
>
> The discovery rule does not change these basic propositions, it simply defines some of the elements. That is, the discovery rule is so named because it tolls the statute of limitations until the plaintiff discovers or with reasonable diligence should have discovered that he or she has suffered actual damage due to wrongs committed by a particular, identified person.
> . . .
> The cause of an injury is 'discovered' when a potential plaintiff has information that would give a reasonable person notice of the cause of injury. This does not mean that if there is more than one reasonable cause of the injury that discovery cannot occur. A plaintiff cannot wait until he or she is certain about the cause, or wait for expert verification of known information. A valid legal opinion is not necessary for discovery to occur. Discovery occurs when the potential plaintiff has information that would give a reasonable person notice of her injury and its cause regardless of whether she has been given a misleading legal opinion.

*French v. Atty's Liability Assur. Soc.*, No. 2015-AP-758, 2016 WL 2745512 *4 (Wis. Ct. App. May 12, 2016) (citations and quotations omitted).

2000, when he was revoked. Further, in briefs filed in 2001 and 2008, Huber argued that he had been improperly revoked because his probation had expired on November 3, 1995. Thus, Defendants maintain that his claim accrued as many as sixteen, but at least eight, years ago.

Huber counters that he did not learn of the precise nature of his injury until after his 2001 and 2008 arguments were made. For each of those briefs, Huber claims that he did not raise the arguments he now raises because he did not know about them at the time. Specifically, Huber identifies his injury as the Department losing jurisdiction over him because it failed to have the Reinstatement Form signed until after his supervision had technically ended. He did not know that the form was not properly completed in 2001 or 2008; he believed it did not exist at all.

This position, even if true, does not save his claims. The Seventh Circuit "use[s] a two-step test to determine the accrual date: (1) we identify the injury and (2) we determine when the plaintiff could have sued for that injury." *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011). Here, Huber has too narrowly defined his injury. In his 2008 brief, Huber challenged the lawfulness of his supervision, and subsequent revocations and convictions, based on the fact that his supervision had expired in 1995 and was not properly tolled. (Docket #70-13 at 4-7). At least as of that time, the substance of Huber's challenge was the same as in this lawsuit. The fact that Huber did not know about one additional piece of evidence to support the claim, the tardy Reinstatement Form, is not in itself a new claim. It was merely additional evidence to support his position. This shows the very reason why Huber should have filed this lawsuit sooner—he would have obtained the

form in discovery, prior to it being given to him in 2010.[9] Thus, Huber had knowledge sufficient to bring a false imprisonment suit at least in 2008.

Huber makes one other primary contention on this point, but it lacks merit. He believes he needed to have his conviction overturned before he could sue for false imprisonment. This is contrary to the U.S. Supreme Court's *Wallace* decision. There, the court ruled that false imprisonment claims accrue as of the date of arraignment on the underlying charge. *Wallace v. Kato*, 549 U.S. 384, 389 (2007). After that point, a plaintiff's potential claim transforms into one for malicious prosecution, which as noted above, *does* require that the underlying charge be overturned. *Id.* at 390. Huber further notes that the *Heck* doctrine, which prohibits Section 1983 lawsuits that impugn the validity of a criminal conviction while that conviction still stands, seems to apply here. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). *Wallace* addressed Huber's concern:

> [The court asked] whether, assuming that the *Heck* bar takes effect when the later conviction is obtained, the statute of limitations on the once valid cause of action is tolled as long as the *Heck* bar subsists. In the context of the present case: If petitioner's conviction on April 19, 1996, caused the statute of limitations on his (possibly) impugning but yet-to-be-filed cause of action to be tolled until that conviction was set aside, his filing here would have been timely.
>
> We have generally referred to state law for tolling rules, just as we have for the length of statutes of limitations. Petitioner has not brought to our attention, nor are we aware of, Illinois cases providing tolling in even remotely comparable circumstances. (Indeed, petitioner did not even argue for such tolling below, though he supported its suggestion at oral argument.) Nor would we be inclined to adopt a federal tolling

---

[9]Huber states that he first learned of the Reinstatement Form in 2010 when it was provided to him in connection with other documents in a criminal case.

Case 2:16-cv-00019-JPS   Filed 12/09/16   Page 13 of 22   Document 97

rule to this effect. Under such a regime, it would not be known whether tolling is appropriate by reason of the *Heck* bar until it is established that the newly entered conviction would be impugned by the not-yet-filed, and thus utterly indeterminate, § 1983 claim. It would hardly be desirable to place the question of tolling *vel non* in this jurisprudential limbo, leaving it to be determined by those later events, and then pronouncing it retroactively. Defendants need to be on notice to preserve beyond the normal limitations period evidence that will be needed for their defense; and a statute that becomes retroactively extended, by the action of the plaintiff in crafting a conviction-impugning cause of action, is hardly a statute of repose.

*Wallace*, 549 U.S. at 394-95.

The Court is obliged to follow the *Wallace* rule. The parties have not cited, and the Court has not found, any Wisconsin case which would provide *Heck*-like tolling for the applicable statute of limitations, Wis. State. § 893.53, in a false imprisonment case. Further, *Wallace* declined to create an analogous federal tolling rule, so even assuming a federal rule would apply, *see supra* note 7, it does not exist. Thus, the Court concludes that Huber's claims against Anderson, Hartmann, and Kasprzak are stale, and must be dismissed.

As to Walczak, the analysis is more straightforward. His contribution to Huber's alleged false imprisonment occurred in 2000. It appears Huber advances this claim on two fronts: first, that Walczak hid the Reinstatement Form and thereby contributed to the entire subsequent timeline of his false imprisonment, and second, that Walczak pursued revocation to cover up his theft. In both cases, the claim fails for the same reasons stated above. As to the first iteration of the claim, Huber was equipped to pursue it no later than 2008. As to the second iteration, he was able to file the claim immediately;

Huber believed from the outset of Walczak's revocation that Walczak was pursuing it for an improper purpose. This also disposes of the related retaliation claim, for the same reason. The final Walczak claim, interference with Huber's access to the courts, is based on the same conduct, namely hiding the Reinstatement Form. Here, Huber raised the issue in a May 2009 probation plan, stating that "[a]n attorney has advised me that [] new evidence has come to light which shows that the same P.O. (Mr. Walczak) provided falsified documentation and lied in order to have an already expired term of probation revoked[.]" (Docket #70-12 at 3). As with his false imprisonment claims, Huber asserts that this concern was not yet based on the Reinstatement Form. Again, this too narrowly construes the "injury" for which he could file his lawsuit. The quoted statement shows that Huber believed that Walczak had unlawfully pursued revocation based on false documents. This is all that was required to file the claim, and Huber knew of it at least as of 2009. Thus, his access to courts claim is no less than seven years late.

### 5.2    Bock and Walter

Huber's three claims against Bock and Walter will not survive summary judgment. First, Huber's failure to intervene claim must be rejected because the alleged underlying constitutional violations committed by the above defendants are time-barred. *Rosado v. Gonzalez*, 832 F.3d 714, 718 (7th Cir. 2016) ("'In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation....' *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). The underlying constitutional violation here is a time-barred false-arrest claim. Because the claim of false arrest is time-barred, the derivative claim of a failure to intervene during the false arrest is also time-barred.").

Second, unlike with Walczak, Huber's access to courts claim is timely and the Court can reach its merits. Huber fails, however, to adduce sufficient evidence to avoid dismissal of the claim. As noted by Magistrate Jones, the access to courts claim is, in essence, a retaliation claim; it is based on Bock and Walter's interference with Huber's attempts to obtain relief from his supervision, and his claims that the interference was based on either personal animus (distaste for his underlying crimes) or a desire to keep him from finding an exit from his supervision. (Docket #8 at 9-10).

To prevail on such a claim, "a prisoner must show that state officials took action to punish him for engaging in constitutionally protected conduct, such as speech or exercising his right of access to the courts." *Szymankiewicz v. Doying*, 187 F. App'x 618, 622 (7th Cir. 2006). "[T]he burden on the prisoner[,]" however, "is high as he must show that his protected conduct was a motivating factor for the retaliation and that events would have transpired differently had there been no retaliatory motive." *Id.* Bock and Walter offer testimony that they did not seek to revoke Huber's supervision because of any issue with his legal research. Instead, they state that regardless of the research issue, they would have sought revocation based on his numerous rules violations. This defeats both elements described by *Szymankiewicz*.

Huber's evidence to the contrary cannot avoid this result. It consists of (1) accusing the two of lying about their motives, (2) the timing between the legal research issue and the revocation, (3) the fact that Walter told Bock not to advocate for Huber's release from supervision, and (4) that the Department had no jurisdiction over him, and he had told them that repeatedly. As to the first point, no matter how genuine Huber's belief that Bock and Walter have lied in their testimony, that belief does not actually

controvert the testimony. *Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013) (In light of the defendants' affidavit testimony, the court found that the prisoner's "speculation regarding the officers' motive cannot overcome the contrary evidence that Gallegos and Smiley's actions were benign."). Both have testified unequivocally as to their motivations, and Huber's contrary beliefs are not competent to dispute that. *McMillian v. Sventanoff*, 787 F.2d 186, 191 (7th Cir. 1989). As to the second point, this contention is not only mere speculation as to suspicious timing, but it further ignores Bock and Walter's testimony that Huber was revoked for his various rules violations, not for any issue with his legal research activities. *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008) ("Suspicious timing may be enough to meet the minimal burden of establishing a prima facie case, but suspicious timing alone is generally insufficient to establish a genuine issue of material fact for trial.").

As to the third point, Walter's statement to Bock was nothing more than correctly informing Bock of the extent of her job duties. It is unreasonable to infer, as Huber suggests, that this statement was based on actual knowledge that Huber had a valid basis to challenge his supervision, and that Walter and Bock wanted to cover up that fact. As to the final point, Bock and Walter reasonably investigated the propriety of Huber's supervision. As discussed more fully below, nothing they did could support an inference that they knew he was improperly under supervision but proceeded to revoke him anyway. In sum, Huber has presented no more than speculation as to Bock and Walter's motives which is insufficient to dispute their unequivocal testimony; in other words, no reasonable jury could infer from this evidence the nefarious intent required to prove the claim. *Williams*, 809 F.3d at 941.

Huber's final claim against Bock and Walter is for deliberate indifference to his right to be free from false imprisonment. The *Figgs* court has explained the standard thusly:

> Deliberate indifference requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk. [*Armato v. Grounds*, 766 F.3d 713, 721 (7th Cir. 2014)]; *McGee v. Adams*, 721 F.3d 474, 480–81 (7th Cir. 2013). A state officer is deliberately indifferent when he does nothing, *Hankins v. Lowe*, 786 F.3d 603, 605 (7th Cir. 2015), or when he takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred, [*Burke v. Johnston*, 452 F.3d 665, 669 (7th Cir. 2006)] (citing *Moore v. Tartler*, 986 F.2d 682, 686 (3d Cir. 1993)); *see also Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (noting that a prison doctor demonstrates deliberate indifference by pursuing treatment "so blatantly inappropriate as to evidence intentional mistreatment").

*Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016). As explained above, Huber has no direct evidence that Bock or Walter knew that his supervision was improper and that they intentionally disregarded the fact. Thus, Huber's only avenue to avoid summary judgment is to show that their response to his complaint was "so ineffectual under the circumstances" that their intent to wrongfully keep him on supervision, or at least their criminal recklessness as to the impropriety of his supervision, can be reasonably inferred by a jury. *Id.* at 903.

The *Figgs* case offers substantial guidance in assessing this question. In *Figgs*, a prisoner filed several complaints that his release date had been miscalculated. *Id.* at 899-900. At least one of these complaints went to the prison warden, Dawson, and one went to a "record office supervisor," Fishel. *Id.* at 900. Dawson consulted with Fishel and allowed her to look into the calculation issue. *Id.* at 903. The court held that Dawson was not deliberately

indifferent because he reasonably delegated the investigation to Fishel, whose specific job functions included performing this task. *Id.* at 903-04.

In her investigation, Fishel initially reviewed Figgs' sentence calculation and believed it was correct. *Id.* at 900. However, because of various "corrections" to the sentence, Fishel thought that the issue was too complex for her. *Id.* She stated that she "didn't do too much with it" and instead referred the issue to the state's chief record office. *Id.* Fishel sent some, but not all, of Figgs' case file to that office. *Id.* The office informed Fishel that the sentence calculation was correct, and so she did nothing more to investigate. *Id.* Later, when Figgs sent an emergency grievance to Fishel regarding his sentence calculation, she simply reiterated that it was correct, without conducting her own sentence calculation or checking again with the chief office. *Id.*

The court held that summary judgment was improper for Fishel, and explained as follows:

> The record belies Fishel's assertion that her investigation of Figgs's complaints was "thorough." Her reliance upon the previous sentence calculation, which was done long before Figgs complained, did not constitute a step taken to verify its accuracy (nor did her reliance upon the chief record office's determination). The only action she took prior to the state court's denial of Dawson's summary judgment motion was forwarding selected portions of Figgs's master file to the chief record office after receiving several inmate request slips. In response to Figgs's emergency grievance, Fishel relied on the same prior determination by the chief record office without further investigation.

*Id.* at 905.

Here, Bock and Walter are more like Dawson, not Fishel. Bock is a parole agent working directly with offenders under supervision. Walter is

her direct supervisor. Though they can receive an offender's concern about their supervision dates, the CRU is the final authority on sentencing calculations and discharge dates. Thus, unlike Fishel, who apparently had authority to recalculate Figgs' sentence, Bock and Walter had to defer to the CRU's authority. Further, Fishel's primary duty was recordkeeping; Bock and Walter are more like Dawson, who was entitled to entrust records review and calculations to Fishel or others. They did not merely pass off what was supposed to be their job because the situation looked complex, but instead allowed the CRU to serve its function and give the final say on whether Huber was properly on supervision.

This analogy is buttressed by comparing what Fishel and Bock/Walter had access to when addressing the complaints directed to them. Fishel, a recordkeeper herself, had access to, and could have reviewed, Figgs' master file to do her own sentence calculation. Bock and Walter only had Huber's parole and supervision file which, despite its name, the parties agree did not contain every document related to Huber's decades-long supervision and his criminal history. *See* (Docket #86 at ¶¶ 77, 132; Docket #82 at ¶ 70). Instead, it was a piecemeal collection of documents handed down from agent to agent, and the fact that certain documents were not in it did not mean that those documents were non-existent.[10] This is confirmed by Bock's testimony at Huber's 2012 revocation proceedings, where she stated that she had reviewed his file and found Anderson's notations regarding tolling and the Reinstatement Form. (Docket #61-1 at 42-46). Critically, there is no evidence

---

[10]In fact, Huber asserts that the file contained "records that were falsified to make it appear that Huber was still on supervision," confirming that Bock and Walter could not have discovered Anderson's error which happened decades ago. (Docket #86 at ¶ 131).

Case 2:16-cv-00019-JPS   Filed 12/09/16   Page 20 of 22   Document 97

that the Reinstatement Form itself was actually in the file at that time. *Id.* She concluded that the lack of the Reinstatement Form and other tolling documents did not mean that they did not exist. *Id.* Thus, not only were Bock and Walter entitled to rely on the CRU, but they were not equipped to dispute its contention, as Fishel was, even after reviewing the records they could access. Ultimately, the Court cannot say that their actions would not amount to negligence (as with any of these defendants), but they were not "so ineffectual under the circumstances" that a reasonable jury could infer intentionality or criminal recklessness. *Figgs*, 829 F.3d at 903.

**6.    CONCLUSION**

Even when viewing the facts in a light most favorable to Huber, his claims fail for the reasons stated above. The Court must, therefore, grant Defendants' motion for summary judgment and necessarily deny Huber's.

Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment (Docket #63) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment (Docket #57) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for sanctions (Docket #73) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the defendants' motion to amend their summary judgment briefing (Docket #75) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion to strike and for sanctions (Docket #89) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice.**

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 9th day of December, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge